[No. 56236-9.   En Banc.   November 14, 1991.]

JOHN DOE, ET AL, *Respondents*, v. PUGET SOUND BLOOD CENTER, *Petitioner*.

*Sloan & Bobrick*, by *Sandra B. Bobrick*, for petitioner.

*Markovich & Talcott, P.C.*, by *Stanley Merritt Talcott*, for John and Jane Donor.

*Day, Herman & Recor*, by *Steven P. Recor* and *Robert B. Jackson*, for respondents.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington State Trial Lawyers Association, amicus curiae for petitioner.

*Heather Houston* and *Sam Pailca* on behalf of Washington Defense Trial Lawyers Association; *Kenneth A. Letzler, Karen S. Wagner, Karen Shoos Lipton, Steven Labensky*, and *David M. Jacobi* on behalf of the American National Red Cross, American Association of Blood Banks, and Council of Community Blood Banks; *Robert J. Rohan* on behalf of The Northwest AIDS Foundation; *Stephen K. Causseaux, Jr.*, on behalf of Tacoma-Pierce County Health Department; and *Andrew K. Dolan* on behalf of the Washington State Medical Association, amici curiae for the blood center.

BRACHTENBACH, J. — This case involves a discovery order which directed defendant Puget Sound Blood Center (hereafter Blood Center) to disclose the name of the person (Donor X) who donated blood to the Blood Center; that blood was later transfused to plaintiff during emergency surgery.

Plaintiff alleges that the blood he received was "contaminated with the Acquired Immune Deficiency Syndrome

(AIDS) virus."[1] Clerk's Papers, at 163. Plaintiff alleges, as one of several liability theories, that the Blood Center "failed to design and implement reasonable screening and/or testing procedures which would have prevented the dissemination and administration of blood contaminated with the AIDS virus to the plaintiff." Clerk's Papers, at 164.

Plaintiff died in June 1988, allegedly as a result of his AIDS condition. The record discloses that the donor died from complications associated with AIDS. The actual names of the plaintiff-blood recipient and his wife were disclosed in the original pleadings. Those names have been changed to John and Jane Doe and John Doe's estate substituted for the deceased blood recipient. The file was sealed pursuant to stipulation. The donor is not a party to this suit, and has not been named as a "John Doe" defendant.

The blood transfusion to plaintiff Doe occurred in August 1984. Almost a year later, Donor X, who had donated before, planned to donate blood to the Blood Center. However, Donor X tested positive to a test (ELISA) which indicated the presence of the human immunodeficiency virus. The Blood Bank later determined that Donor X was the source of the blood earlier transfused to plaintiff. Two years after Donor X tested positive, the Blood Center advised plaintiff that the blood he had received may have been HIV contaminated.

Plaintiff contends the identity of Donor X is necessary to investigate the Blood Center's "contention that thorough screening had occurred," and "to pursue his claims against the blood bank, and if the circumstances warrant, an independent negligence action against the donor." Brief of Respondent, at 4, 35. Plaintiff sought an order compelling identity of the donor, or alternatively, an order prohibiting

---

[1] We make no effort to summarize or comment upon the scientific and medical aspects of AIDS, nor the nature of HIV testing, past or present. The literature is extensive. *See, e.g., Aids and the Courts* (1990); Symposium, 9 J. Legal Med. 489 (1988); Note, *Aids: Blood Bank Liability*, 27 Willamette L. Rev. 355 (1991).

the Blood Center from asserting a defense that its testing/ screening procedures complied with the applicable standard of care. Clerk's Papers, at 181, 189.

The trial court entered the following order (in relevant part):

> 1. The defendant blood center shall . . . disclose to plaintiff in writing identifying information which it may possess concerning the blood donor including his or her name, address, telephone number and social security number. Such information shall be kept confidential until such time as the donor is named a defendant herein. The donor shall not be joined as a defendant w/out prior court approval. . . .

Clerk's Papers, at 231.

The Blood Center seeks reversal of the discovery order, contending that the order is an abuse of the trial court's discretion. Brief of Petitioner, at 1. The Blood Center appeals in its own right (Clerk's Papers, at 232), but asserts rights and privileges of Donor X. Brief of Petitioner, at 16. We emphasize that Donor X, now deceased, is not a party to this suit, no action by plaintiff is pending against Donor X or his estate; indeed, there has been no disclosure of the identity of Donor X. We affirm.

The ultimate issue is whether the trial court abused its discretion by ordering disclosure of the identity of Donor X, subject to the conditions and limitations of the order, upon the record before the court. To decide the ultimate issue we must (1) consider the standard of review, (2) determine whether the identity of Donor X is privileged, (3) determine whether nondisclosure is justified under CR 26(c), and (4) determine whether to consider the Blood Center's assertion of Donor X's claimed right of privacy.

In summary, we hold: (1) the statutory physician-patient privilege does not apply; (2) we will not consider whether there is a common law privilege because this argument was not presented to the trial court; (3) the interests of plaintiffs, defendant, and Donor X are competing and conflicting interests, but after identifying and weighing those interests,

we do not find an abuse of discretion by the trial court; and (4) on this record we cannot decide the claim of privacy asserted on behalf of the deceased donor.

## I
### THE SCOPE OF DISCOVERY AND REVIEW
### OF A DISCOVERY ORDER

The fundamental principle of discovery is that a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . .." CR 26(b)(1). The first limitation, privilege, is not applicable, as discussed hereafter. The second limitation, relevancy, is not questioned.

However, a measure of protection to litigants and others is provided by CR 26(c) which permits a variety of restrictions when, *for good cause shown*, "*justice* requires [an order] to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . .." (Italics ours.) It is to be noted that the limitations or restrictions contemplated by CR 26(c) are dependent upon (1) a showing of good cause, and (2) that justice requires the limitation or restriction. The reasons for protecting a party or person must be found to exist and be stated as such.

Within the generalities of the rule, it is the proper function of the trial court to exercise its discretion in the control of litigation before it. *Marine Power & Equip. Co. v. Department of Transp.*, 107 Wn.2d 872, 875-76, 734 P.2d 480 (1987) (citing and quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984)). Exercise of that discretion will not be interfered with by an appellate court unless there has been an abuse of discretion which caused prejudice to a party or person. *Weber v. Biddle*, 72 Wn.2d 22, 29, 431 P.2d 705 (1967); *Barfield v. Seattle*, 100 Wn.2d 878, 887, 676 P.2d 438 (1984); 4 J. Moore & J. Lucas, *Federal Practice* 26.02 (2d ed. 1989); 8 C. Wright & A. Miller, *Federal Practice* § 2006 (1970).

The relevant principles involved in the exercise of discretion were well stated in *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971):

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *State ex rel. Clark v. Hogan*, 49 Wn.2d 457, 303 P.2d 290 (1956). Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *MacKay v. MacKay*, 55 Wn.2d 344, 347 P.2d 1062 (1959); *State ex rel. Nielsen v. Superior Court*, 7 Wn.2d 562, 110 P.2d 645, 115 P.2d 142 (1941).

To obtain reversal of the discovery order, absent privilege or irrelevancy, defendant here must demonstrate good cause such that justice requires a denial for the reasons stated in CR 26(c). Given the latitude of discretion accorded the trial court, defendant must show that the trial court abused that discretion. The components of review are contained in *State ex rel. Carroll v. Junker, supra* at 26:

> Whether this discretion is based on untenable grounds, or is manifestly unreasonable, or is arbitrarily exercised, depends upon the comparative and compelling public or private interests of those affected by the order or decision and the comparative weight of the reasons for and against the decision one way or the other.

To apply that test to the exercise of discretion by the trial court in granting this discovery order, with its protective elements, thus requires this court to identify and weigh the comparative and compelling public and private interests of plaintiff, defendant and the donor. *See Rhinehart v. Seattle Times Co.*, 98 Wn.2d 226, 256, 654 P.2d 673 (1982), *aff'd*, 467 U.S. 20, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984); *Boutte v. Blood Sys., Inc.*, 127 F.R.D. 122, 125-26 (W.D. La. 1989). First, however, we consider the privilege issue.

## II
## PRIVILEGE

CR 26(b)(1) provides that a party "may obtain discovery regarding any matter, not privileged . . .." The Blood Center asserts two privileges.

A. Physician-Patient Privilege.

The Blood Center argues that it has standing to assert the physician-patient privilege on behalf of the deceased donor, citing *St. Louis Little Rock Hosp., Inc. v. Gaertner*, 682 S.W.2d 146 (Mo. Ct. App. 1984), *Parkson v. Central DuPage Hosp.*, 105 Ill. App. 3d 850, 435 N.E.2d 140 (1982), and *Board of Med. Quality Assur. v. Gherardini*, 93 Cal. App. 3d 669, 156 Cal. Rptr. 55 (1979). We need not decide this question because we hold that the privilege is not applicable.

RCW 5.60.060(4) protects a physician from examination, without his patient's consent, in a civil action, "as to any information acquired in attending such patient, which was necessary to enable him or her to prescribe or act for the patient . . .." On its face the language of the statute demonstrates that it is not applicable here. The donor was not attended by a physician, the donor was not seeking medical treatment, nor was information acquired to enable the Blood Center to prescribe for the "patient".

Relevant authorities hold that the privilege does not apply to blood donations. *Doe v. University of Cincinnati*, 42 Ohio App. 3d 227, 230, 538 N.E.2d 419, 423 (1988): "The blood donor is not seeking any treatment for himself and his answers do not fall within the definition of 'communication' for purposes of invoking the physician-patient privilege . . .." *Accord, Belle Bonfils Mem. Blood Ctr. v. District Court*, 763 P.2d 1003, 1009 (Colo. 1988); *Tarrant Cy. Hosp. Dist. v. Hughes*, 734 S.W.2d 675, 677 (Tex. Ct. App. 1987).

We agree with these courts. The information about Donor X's identity is not protected by the physician-patient privilege.

B. Common Law Privilege.

The elements of a common law privilege are set out in *State v. Maxon*, 110 Wn.2d 564, 572, 756 P.2d 1297 (1988). Plaintiff objects to consideration of this theory because it was not advanced in the trial court.

■ "We will not consider a theory as ground for reversal unless . . . the issue was first presented to the trial court." *Talps v. Arreola*, 83 Wn.2d 655, 658, 521 P.2d 206 (1974); *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 313, 553 P.2d 423 (1976), *appeal dismissed*, 430 U.S. 952 (1977). Because this theory was not advanced below, we decline to rule upon the existence of any common law privilege.

### III
### THE INTERESTS INVOLVED

As discussed above, the trial court's exercise of discretion under CR 26(c) involves an identification of and a weighing of those interests relevant to the factors delineated in CR 26(c). We turn to that task.

A. Plaintiff's Interests.

Plaintiff has a right of access to the courts. In this civil case that right of access includes the right of discovery authorized by the civil rules, subject to the limitations contained therein.

■ Our constitution mandates that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." Const. art. 1, § 10. That justice which is to be administered openly is not an abstract theory of constitutional law, but rather is the bedrock foundation upon which rest all the people's rights and obligations. In the course of administering justice the courts protect those rights and enforce those obligations. Indeed, the very first enactment of our state constitution is the declaration that governments are established to protect and maintain individual rights.

Const. art. 1, § 1. Const. art. 1, §§ 1-31 catalog those fundamental rights of our citizens.

The drafters of our constitution placed such great importance upon rights that they provided: "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Const. art. 1, § 32.

It is important to note that our consideration here is of the right of *access*. We are not here considering the validity of a theory of recovery. We are not considering legislative or judicial creation or abolition of a cause of action. We are not considering the abrogation or diminishment of a common law right. These are all issues for other cases. *See* Wiggins, Harnetiaux & Whaley, *Washington's 1986 Tort Legislation and the State Constitution: Testing the Limits*, 22 Gonz. L. Rev. 193 (1986-1988).

Our cases on the right of access are somewhat perplexing. Several cases concern access for the indigent. In *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969), the court waived the filing fee to insure access for the poor. In *Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973), the court was concerned with fees and costs for an appeal. The court said: "The administration of justice demands that the doors of the judicial system be open to the indigent as well as to those who can afford to pay the costs of pursuing judicial relief", and "[c]onsistent with *our affirmative duty to keep the doors of justice open to all* with what appears to be a meritorious claim for judicial relief, we hold that the plaintiff is entitled to the relief requested [waiver of fees and costs]." (Italics ours.) *Iverson*, at 167-68.

In *Carter v. UW*, 85 Wn.2d 391, 399, 536 P.2d 618 (1975), the plurality opinion held that the right of access to the courts was a fundamental right. The plurality opinion relied on Const. art. 1, § 4, the right of petition, and Const. art. 1, § 12, privileges and immunities. However, the court soon considered the question again in *Housing Auth. v. Saylors*, 87 Wn.2d 732, 557 P.2d 321 (1976). The *Saylors* court held that reliance upon the cited constitutional provisions was in error.

However, the important point in *Saylors* is the statement that "[a]ccess to the courts is amply and expressly protected by other provisions." *Saylors*, at 742. Unfortunately, the court did not explore the rationale for its conclusion.

A claim for personal injury was afforded the constitutional right of equal protection in *Hunter v. North Mason High Sch.*, 85 Wn.2d 810, 814, 539 P.2d 845 (1975), where the court held: "The right to be indemnified for personal injuries is a substantial property right . . . ."

The right of access is necessarily accompanied by those rights accorded litigants by statute, court rule or the inherent powers of the court, for example, service of process, RCW 4.28, or statutes of limitation. RCW 4.16 may be in aid of or limitation of a particular cause of action. The merits of a particular action may depend upon statute. *E.g.*, RCW 4.24. The recognition of a particular cause of action may depend upon judicial decisions. *E.g.*, *Merrick v. Sutterlin*, 93 Wn.2d 411, 610 P.2d 891 (1980) (no parental immunity when child injured as result of negligent driving by parent); *Jenkins v. Snohomish Cy. PUD 1*, 105 Wn.2d 99, 713 P.2d 79 (1986) (parental immunity applies where injury results from negligent parental supervision of child).

These statutes and cases are cited to illustrate that access does not carry with it any guaranty of success, but also to demonstrate that access must be exercised within the broader framework of the law as expressed in statutes, cases, and court rules.

The court rules recognize and implement the right of access. The discovery rules, specifically CR 26 and its companion rules, CR 27-37, grant a broad right of discovery which is subject to the relatively narrow restrictions of CR 26(c). This broad right of discovery is necessary to ensure access to the party seeking the discovery. It is common legal knowledge that extensive discovery is necessary to effectively pursue either a plaintiff's claim or a defendant's defense. Thus, the right of access as previously discussed is a general principle, implicated whenever a party seeks discovery. It justifies the limited nature of the exceptions to

broad discovery found in CR 26(c). Plaintiff, as the party seeking discovery, therefore has a significant interest in receiving it.

This interest is even more pronounced in the present case because of the nature of the information sought. Here, the donor is the only source, besides defendant, of the information plaintiff seeks relative to the adequacy of the blood bank's screening procedures. These procedures are the very heart of plaintiff's negligence claim. Plaintiff has therefore demonstrated not only a general interest in discovery, but also a considerable interest based on his particular circumstances.

Thus, plaintiff's right of access to the courts and his concomitant right of discovery must be accorded a high priority in weighing the respective interests of the parties in litigation. Moreover, plaintiff's demonstrated need for discovery under the facts of this case further strengthens his interest in discovery. We now consider the interests advanced by defendant.

B. Right of Privacy.

The Blood Center argues that the donor and his family have a right of privacy under the federal and state constitutions. Blood Center states that state action is required to invoke the claimed constitutional right; it cites no authority on the issue. *See* Bollow & Lapp, *Protecting the Confidentiality of Blood Donors' Identities in AIDS Litigation*, 37 Drake L. Rev. 343, 355 (1987-1988). We need not consider the state action issue. RAP 10.3(a)(5).

Blood Center also recognizes that it is necessary to establish its standing to assert the claimed constitutional right of privacy of the donor. While it asserts that the donor's family also has such a right, it does not address the standing issue as to that claim. We do not address this question, however, because for other reasons the privacy issue cannot be decided on this record. The record discloses that the donor died from complications associated with AIDS sometime in 1989, apparently after the disclosure order. The Blood Center asserts that the donor's death "does not change the

significant issues at stake here." Brief of Petitioner, at 66. We disagree.

The death of the donor raises a number of major issues not addressed by the parties. If a right of privacy exists, does that right survive the death of the person to whom that right belongs? If there is a right of privacy in one's reputation, does that right include a postdeath interest in a predeath reputation? Do family members have a continuing privacy interest in the affairs of the decedent which they can assert? If so, which family members?

It is asserted that disclosure of donor identification "can threaten family relationships, job security, employability and the ability to obtain credit, insurance and housing." Brief of Petitioner, at 42. Similar reasons were cited in *South Fla. Blood Serv., Inc. v. Rasmussen*, 467 So. 2d 798 (Fla. Dist. Ct. App. 1985), *aff'd on other grounds*, 500 So. 2d 533, 56 A.L.R.4th 739 (Fla. 1987). When the donor has died, these reasons for confidentiality would seem to disappear. Thus, if there existed legitimate grounds to be considered in weighing and balancing competing interests, should those grounds be recognized and considered when they can no longer impact the decedent? While appellant cites some authority for the proposition that the physician-patient privilege survives the patient's death, appellant cites no authority on the question whether a state or federal constitutional right of privacy survives.

Blood Center also appears to claim a donor's right to "expected confidentiality with respect to extremely private and embarrassing matters," within the scope of CR 26(c). Brief of Petitioner, at 21. Again, the Blood Bank does not address this claimed interest in light of the fact of the donor's death.

Also missing from the record is any information about dissemination of information about the nature of donor's fatal illness at or following his death. If such occurred, it would bear on the need for confidentiality as well as raise a question of waiver, possibly depending on the source and

extent of disclosure. It is a matter for possible consideration in the balancing process.

■ We understand the desire of Blood Center and amici to obtain a precedential ruling on the privacy issue. However, the record raises significant issues which are not addressed. Petitioner's brief was prepared with knowledge of the donor's death. This is not a moot case, nor are these issues unknown to the parties. The law is unsettled, but the court should not engage in conjectural resolution of issues present, but not briefed. *Spokane v. Douglass*, 115 Wn.2d 171, 183, 795 P.2d 693 (1990); *Alverado v. WPPSS*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004 (1989).

C. Public Policy.

■ The Blood Center and its allied amici seek a decision based upon public policy, arguing that the public's interest in an adequate blood supply outweighs any interest of plaintiff. Public policy is a valid basis for judicial decision. Unfortunately, many cases rely on public policy for their rationale without an identification of or discussion of the sources of the facts or opinions from which the court has drawn its policy conclusions. Brachtenbach, *Public Policy in Judicial Decisions*, 21 Gonz. L. Rev. 1 (1985-1986).

The problems inherent in the use of policy-based rationale are well recognized.

> The kinds of policy argument which can be successfully addressed to a court depend on the sources of information which the court has, to evaluate them and to assess the impact on the community of their implementation. . . .
>
> . . . .
>
> Apart from what can be gleaned from statutes and previous cases, discussion of social conditions and social attitudes takes place for the most part on the basis of unsupported assertions of social fact and projections of future benefits or disasters which would follow the adoption of a particular new rule, which rest on the judges' appreciation of human nature.

J. Bell, *Policy Arguments in Judicial Decisions* 67 (1983).

Because of these difficulties, we analyze and comment upon the materials here presented.

The Blood Center contends that confidentiality of donor identity is essential to continued blood donations from volunteers; that confidentiality is the practice of the Blood Center as well as the American Red Cross, the Council of Community Blood Centers, and the American Association of Blood Banks; that volunteers "will not donate without this safeguard." Brief of Petitioner, at 25. Further, it is asserted, by affidavit, that "prudent, but overly inclusive measures, used to screen for AIDS and other infectious diseases, have reduced the donor base by excluding many healthy donors," Clerk's Papers, at 195, and that "the threat of disclosure will encourage people to give false or inaccurate information when donating blood." Brief of Petitioner, at 30.

■ The Blood Center and allied amici attempt to support these contentions with materials ranging from a quote from Newsweek Magazine to a quote from the Secretary of State of Scotland to testimony before a congressional subcommittee. First, we note that according to the record much of the material here offered was not before the trial court. Second, some of the factual information asserted is not in the record. For example, amicus Washington State Medical Association asserts as a *fact* the cost of tests to detect disease and the percentage of decline in donations because of the AIDS "drama" and the reason therefor. The brief states that donors were given firm assurances, in good faith, that the information they gave was absolutely confidential. Brief of amicus Washington State Medical Association, at 9, 12, 14. These are matters of fact which may be entirely accurate, but which have no support in the record.

■ Third, some of the material submitted in or appended to the briefs could only be admissible as expert testimony. However, other than identification by title or position held, there is no qualification of the experts. CR 56(e); ER 702-703; *see McKee v. American Home Prods. Corp.*, 113 Wn.2d 701, 706, 782 P.2d 1045 (1989). Fourth, the only affidavit presented to the trial court was that of the executive director of the Blood Center. Part of that affidavit is purely conclusory, part would be inadmissible.

For example, the affidavit states that "abrogation" of confidentiality "would violate the rights of privacy of the donors." Clerk's Papers, at 196. That is a legal conclusion and not proper evidence; it must be disregarded. *Orion Corp. v. State*, 103 Wn.2d 441, 462, 693 P.2d 1369 (1985); *Hiskey v. Seattle*, 44 Wn. App. 110, 113, 720 P.2d 867, *review denied*, 107 Wn.2d 1001 (1986). Further, the affidavit states that "Puget Sound Blood Center has always operated with the presumption of and dedication to donor confidentiality." Clerk's Papers, at 196. That proves nothing as to the expectations of donors, nor does it demonstrate that the so-called presumption and dedication were implemented in dealings with donors. The affidavit also contains statements or conclusions with no evidence of factual support. For example, it is stated that an "abrogation" of confidentiality (whatever that means) "would encourage donations of blood in a fashion which could impair the safety of the available blood supply." Clerk's Papers, at 196. There is no disclosed basis for what is at best an opinion of an expert.

In *Grimwood v. University of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988), the court set forth the requirements for facts contained in an affidavit on summary judgment. CR 56(e) requires that the facts set out in the affidavit be material, and second, that those facts be admissible at trial. *Grimwood*, at 359. If the material in an affidavit purports to be the opinion of an expert, it too requires proper qualification. ER 703.

The opinion of an expert which is only a conclusion or which is based on assumptions is not evidence which satisfies the summary judgment standards because it is not evidence which will take a case to the jury. *Theonnes v. Hazen*, 37 Wn. App. 644, 648, 681 P.2d 1284 (1984); *see Hegre v. Simpson Dura-Vent Co.*, 50 Wn. App. 388, 748 P.2d 1131, *review denied*, 110 Wn.2d 1024 (1988). When an affidavit in support of or in opposition to the motion injects matters of fact, or the opinion of an expert, the affidavit must satisfy the criteria for summary judgment.

We now examine the various policy reasons identified by the Blood Center and allied amici as the basis for the policy result they seek, but keeping in mind the difficulties mentioned above.

First, it is self-evident that the public needs an adequate and safe blood supply. The essential issue is what impact there will be upon that blood supply from the limited and restricted disclosure of identity ordered in this case. There are assertions in the supporting materials that disclosure about donors will have two consequences: (1) donors will be less likely to donate blood if they know their identity may be disclosed and inquiries may be made about them, and (2) the possibility of disclosure will encourage donors to give false or inaccurate information when donating.

We recognize that these consequences are predicted by persons who seem to be knowledgeable. Some courts have accepted these consequences as though they were established facts. *E.g.*, *South Fla. Blood Serv., Inc. v. Rasmussen*, 467 So. 2d 798 (Fla. Dist. Ct. App. 1985), *aff'd on other grounds*, 500 So. 2d 533, 56 A.L.R.4th 739 (Fla. 1987). Some amici cite unreported decisions of various trial courts. Brief of amicus American National Red Cross, at 9, 11, and app. They are of little precedential value.

The difficulty with these predictions is that they border on speculation about human conduct in reaction to a limited and restrictive discovery order. It can be argued with equal persuasion that the true public interest is an uninfected blood supply and therefore, public policy *should* discourage donors who are in the high risk groups. We would like to believe that most persons known to be at risk would forgo donation rather than provide false information as suggested by the Blood Center and some amici. Indeed, one would think that the tests now available might detect false information and prevent contaminated blood from entering the blood supply. Part of the difficulty in assessing the public policy considerations are the rapidly changing medical knowledge, including testing, and the apparent public reactions to the entire AIDS epidemic.

■ Admittedly the balancing and weighing of interests and values are difficult. There is apparent merit on both sides. However, given this record and considering the limitations and restrictions imposed by the trial court, we conclude that there has not been a clear showing of an abuse of discretion. In the words of *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 482 P.2d 775 (1971), the exercise of discretion was not manifestly unreasonable, it was not exercised on untenable grounds, or for untenable reasons.

The trial court is affirmed.

UTTER, DOLLIVER, ANDERSEN, DURHAM, and SMITH, JJ., and CALLOW, J. Pro Tem., concur.

## APPENDIX
### Response to Dissent

The dissent asserts that once a plaintiff meets "the requirements of CR 26(b)(1) (relevance and nonprivileged subject matter), the issue of privacy drops out of the case as a matter of law". Dissent, at 790. The dissent misses the entire point. The right of privacy would make the matter privileged.

The dissent finds affirmance by the majority to be confusing and logically inconsistent — because the majority declines consideration of the privacy issue *on this record.* Again the dissent is far off the mark. Establishment of a right of privacy would create another important criteria to be balanced in deciding whether to grant discovery. The majority holds that the death of the donor raises significant issues, not addressed, which precludes determination of the privacy question. There is nothing confusing about the proposition that a discovery order can be affirmed because the defendant did not establish the grounds for a possible defense to discovery, *i.e.*, privacy. The dissent is simply wrong in asserting that the majority has held there is no right of privacy. Dissent, at 792. The majority makes no such holding as evidenced rather clearly by stating "the privacy issue cannot be decided on this record." Majority, at 783.

Next the dissent injects a theory totally irrelevant to this case. It does so by discussing disclosure to meet a valid governmental interest. Dissent, at 796. This is a matter of private litigation, not disclosure *to* the government which is what was involved in the only case cited by

the dissent, *Peninsula Counseling Ctr. v. Rahm*, 105 Wn.2d 929, 935, 719 P.2d 926 (1986).

The majority does not hold that public policy might not justify a different result in another case, or at least create a substantial factor to be considered in balancing the competing interests involved. The majority, rather, points out the inadequacy of the materials submitted to establish public policy. Majority, at 785-87. It does not preclude establishment of public policy by proper means.

Finally, the majority forcefully rejects the dissent's statement that: "[i]n balancing the equities, the rights of citizens without HIV are superior to those who are infected with the disease." Dissent, at 801.

DORE, C.J. (dissenting) — The main difference between our two opinions is that I would affirm, but in doing so, I endorse the trial judge's finding that the blood donor has no right of privacy preventing disclosure of his identity, once John Doe established a prima facie case that Donor X was the source of his contact with the human immunodeficiency virus (HIV). Once such a prima facie case is established meeting the requirements of CR 26(b)(1) (relevance and nonprivileged subject matter), the issue of privacy drops out of the case as a matter of law, leaving Donor X in the same position as any other person, including one with a communicable disease such as HIV, hepatitis, tuberculosis, syphilis or any other serious affliction.

The majority, on the other hand, affirms the trial court's discovery order, but does so without reaching the issue of privacy. This is confusing and logically inconsistent because the trial court's order necessarily finds that there is no right of privacy preventing disclosure of Donor X's identity. For this reason, I dissent.

## ANALYSIS

The trial judge's order ruled that John Doe could proceed with limited discovery as to the identity of Donor X. The order provides:

> 1. The defendant blood center shall . . . disclose to plaintiff in writing identifying information which it may possess concerning the blood donor including his or her name, address,

telephone number and social security number. Such information shall be kept confidential until such time as the donor is named a defendant herein. The donor shall not be joined as a defendant without prior court approval. All depositions and other discovery responses of the donor shall be sealed . . ..

Clerk's Papers, at 231 (order, at 2).

While discovery in HIV cases may delve into sensitive areas of a person's private life, privacy rights must give way at times to the greater societal good of providing civil redress to innocent plaintiff/victims for exposing them to HIV. It is well-settled law that personal rights are not without limitation. There is no doubt that a state may exercise its police powers for the legitimate protection of public health, safety and welfare. *Ketcham v. King Cy. Med. Serv. Corp.*, 81 Wn.2d 565, 569, 502 P.2d 1197 (1972). As early as 1911, this court in passing upon an industrial insurance act aimed at, among other things, providing health care for workers, stated:

[Personal] rights are not absolute. On the contrary, it has been many times said that there is no absolute right to do as one wills, pursue any calling one desires, or contract as one chooses; that the term liberty means absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.

*State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 P. 1107 (1911). From this we learn that individuals' rights often give way in the interests of the larger community.

Here, we must determine whether the blood donor's privacy rights must give way to the paramount civil right of John Doe to seek recovery for his injuries. The trial judge found that they must. I agree. In fact, such a civil remedy is a substantial property right, and constitutionally based under article 1, section 10 of our state constitution. *Hunter v. North Mason High Sch. & Sch. Dist. 403*, 85 Wn.2d 810, 814, 539 P.2d 845 (1975). As such, the State has a compelling interest in preserving this right. Anything less creates de facto immunity in the defendant from his or her wrongdoing. Without disclosure of Donor X's name, John

Doe is foreclosed from seeking damages from a potentially responsible party.

The majority states the issue of privacy cannot be decided on this record. The majority mistakenly believes Donor X's death raises many unanswered questions that were not briefed by the parties. Majority, at 783-85. I disagree. Donor X's death came *after* the discovery order. Our review encompasses the rights of the parties *at the time of the order*, not later. The issue of privacy was fully briefed by all parties and the allied amici, and is clearly before us. The majority simply refuses to deal with the delicate issue of balancing individual privacy rights against a civil plaintiff's state constitutional right to seek redress for his injuries.

Lastly, the blood banks argue that public policy mandates that donor confidentiality be recognized, generally. They contend the public will be reluctant to voluntarily donate blood absent such assurance, and that this will jeopardize the blood supply. I disagree. There is no evidence that the shortage of blood is due to public fear that donor names could be revealed in the event that someone were to sue the blood bank.

I

On August 4, 1984, John Doe, plaintiff, was injured in an automobile accident. As a result of his injuries, Doe was transfused with 4 units of blood while a patient at Overlake Hospital in Bellevue. The blood was provided by Puget Sound Blood Center. In August 1987, it was revealed to John Doe that some of the blood he received was contaminated with HIV. One year later, on June 10, 1988, John Doe died of AIDS-related illness. The anonymous donor (Donor X), who gave the HIV-contaminated blood, died from complications associated with AIDS sometime after May 1989.

II

First, we all agree that even though the parties here have settled, the issues are not moot, as they constitute pressing matters of great public interest and concern. *In re Swanson,*

115 Wn.2d 21, 24, 793 P.2d 962 (1990). Blood centers around the state are currently, or will soon, face similar disclosure issues as the HIV epidemic worsens.

Second, I agree with the majority's holding that disclosure of identifying information about Donor X is not protected by the statutory physician/patient privilege. I would also hold Donor X is not protected by the common law physician/patient privilege.

## III

The spread of the HIV virus has been a media event. In fact, HIV has been heralded as the modern day equivalent of leprosy. *Tarrant Cy. Hosp. Dist. v. Hughes*, 734 S.W.2d 675, 680-81 (Tex. Ct. App. 1987), *cert. denied*, 484 U.S. 1065, 98 L. Ed. 2d 991, 108 S. Ct. 1027 (1988). United Nations health officials predict HIV could infect 40 million people by the end of the century, and nearly one-fourth of those will be afflicted with serious symptoms associated with the onset of the disease.[2] According to the Centers for Disease Control, as of May 31, 1991, an estimated 1 million people in the United States have become infected with HIV but have not yet developed AIDS; an estimated 265,000 people are afflicted with advanced HIV infection; and 179,136 Americans have been diagnosed with full-blown AIDS. The average life span of a person with full-blown AIDS is said to be 239 days after the diagnosis.[3]

The spread of HIV has given rise to heated public debate about the privacy rights of individuals versus the public's right to know the status of infected persons. A recent article in Newsweek reveals that there is a growing sentiment in this country that people have a right to know when health-

---

[2]*Africa, Asia brace for the ravages of AIDS*, Seattle Post-Intelligencer, June 17, 1991, § A, at 3.

[3]R.J. Perey, *Liability for AIDS Contracted by Hemophiliacs and Others from Blood Factor Concentrate and Blood Transfusions* 5 (1991) (unpublished manuscript, see *Trial Advocacy* (Fall 1991)).

care workers are infected with HIV. The poll results are informative:[4]

**Q-1. Which of the following health-care workers should be required to tell patients if they are infected with the AIDS virus?**

95% – Surgeons
94% – All physicians
94% – Dentists
90% – All health-care workers

**Q-2. If you knew a physician, dentist or other health-care worker treating you was infected with the AIDS virus, would you:**

15% – Continue treatment with stringent measures.
13% – Continue treatment but exclude surgery or other invasive procedures.
65% – Discontinue all treatment with that person.

**Q-3. If the following kinds of health-care workers test positive for the AIDS virus should they be forbidden to practice?**

|                        | YES | NO  |
|------------------------|-----|-----|
| Surgeons               | 63% | 28% |
| All Physicians         | 51% | 42% |
| Dentists               | 60% | 33% |
| All health-care workers| 49% | 43% |

**Q-4. Should patients be required to tell physicians, dentists or other health-care workers if they are infected with the AIDS virus?**

97% – YES      2% – NO

The resulting public outcry for disclosure of information regarding HIV-infected persons has led the Centers for

---

[4]For this Newsweek poll, the Gallup Organization interviewed a representative sample of 618 adults by telephone on June 20, 1991. The margin of error is plus or minus 5 percentage points. Some "Don't know" answers are not shown. Kantrowitz, *Doctors and AIDS*, Newsweek, July 1, 1991, at 49-57.

Disease Control to recently release new guidelines recommending HIV testing and disclosure among health-care workers.[5]

The HIV epidemic has now found its way into our courts. HIV is known to be transmitted primarily through sexual activity by "high risk" people (generally homosexuals and bisexuals with multiple sex partners), and through intravenous drug use.[6] Parties seeking to establish liability for their unwilling exposure to HIV will need answers to highly personal questions about the defendant's lifestyle. They will undoubtedly seek those answers not only from the defendant, but from defendant's relatives, friends, co-workers, and others.

Thus, the potential for intrusion into sensitive areas of a person's life is substantial. In addition, victims of the virus are known to suffer discrimination in employment, education, housing, and even medical treatment. *See Rasmussen v. South Fla. Blood Serv., Inc.*, 500 So. 2d 533, 537, 56 A.L.R.4th 739 (Fla. 1987); *see also* AIDS omnibus act, Laws of 1988, ch. 206.

The right of privacy has been held to protect the right of individuals to make certain decisions, without governmental interference, with regard to highly personal matters. Most privacy cases decided by the United States Supreme Court have involved the rights of individuals to make such autonomous decisions. *Tarrant*, at 680-81.

A second general area of privacy rights protect the rights of individuals to prevent unlimited disclosure of personal information. *Whalen v. Roe*, 429 U.S. 589, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977). A person's medical records have been declared to be within the zone of privacy protected by the federal constitution. *Tarrant*, at 681.

As with other highly sensitive personal information, when discovery is sought in HIV-related cases courts must

---

[5]CDC calls for routine HIV tests, Seattle Post-Intelligencer, July 16, 1991, at 1.

[6]See appendix.

engage in a balancing test, weighing the need for the information against the individual's right of privacy, including constitutional rights where applicable, and other relevant societal concerns. Analyzing the issues present here requires that we examine our discovery rules and the protection they provide to the individual. Although the potential for extensive invasion of privacy is inherent in the litigation process, the discovery rules do not distinguish between information that is private or intimate and that to which no privacy interests attach. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984). Rather, CR 26(b)(1) provides that any nonprivileged matter relevant to the subject matter is discoverable.

Under CR 26(c), the trial court is given broad discretion to limit or prohibit discovery in order to protect the privacy rights of an individual. *Rhinehart*, 467 U.S. at 34-36. If the disclosure is carefully tailored to meet a valid governmental interest and the disclosure is no greater than is reasonably necessary, the disclosure is warranted. *Peninsula Counseling Ctr. v. Rahm*, 105 Wn.2d 929, 935, 719 P.2d 926 (1986).

In the present case the trial judge exercised his discretion, finding no protected privacy right in Donor X which would prevent disclosure of his identity. Pursuant to the terms of the discovery order, the trial judge retained broad discretion to decide when and how further disclosure of Donor X's identity might occur.

In deciding whether a protective order is appropriate, the trial judge, in his broad exercise of discretion, must balance the competing interests to be served by granting or denying full discovery. *Rhinehart*, 467 U.S. at 36. The order is only reviewable for an abuse of discretion. A trial court abuses its discretion when its exercise of discretion is manifestly unreasonable or based on untenable grounds or reasons. *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989). "Discretion is abused only where it can be said that no reasonable person

would take the view adopted by the court." *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990).

The majority believes we cannot address the privacy issue, yet by its own admission it identifies privacy as one of the competing interests to be weighed in deciding whether the trial judge abused his discretion in ordering discovery. Majority, at 783-85. It is puzzling to me how the majority can then affirm the trial court, if privacy is removed from consideration. By doing so, the majority does not weigh *all* of the competing interests, but only *some* of them. Furthermore, by affirming the trial judge's order, the majority *must* agree that the blood donor enjoys no right of privacy which would prevent disclosure of his identity, because that is what the trial judge held. See Clerk's Papers, at 231 (order, at 2).

The trial judge's inquiry was correct. John Doe was required to establish a prima facie case at the discovery motion that Donor X was the source of contaminated blood which exposed him to HIV. Once that was established, the trial judge ruled as a matter of law that Donor X had no protected privacy right in preventing disclosure of his identity. The trial judge ordered discovery, with certain limitations. Clerk's Papers, at 231 (order, at 2).

From that point on, privacy drops out of the case. Discovery proceeds against Donor X the same as it would in any other civil matter, regardless of whether his communicable disease is HIV, tuberculosis, syphilis, hepatitis, or any other serious affliction. In affirming the trial court's order, the majority concedes the correctness of this argument. Therefore the majority's statement that we cannot decide the issue of privacy on this record is confusing, at best.

### IV

I find John Doe has a valid interest in undertaking discovery to further seek redress for his injuries. As previously stated, Doe presented evidence establishing a prima facie

case that Donor X was the source of his exposure to HIV. The trial court, satisfied that a prima facie case was established meeting the requirements of CR 26(b)(1), entered the discovery order at issue here. The strict protective order issued by the trial court allowing limited, nonpublic disclosure of Donor X's identity is carefully tailored and no greater than reasonably necessary to further John Doe's substantial interest in furthering his lawsuit.

While our discovery rules protect parties from unsupervised "fishing expeditions", they do not create new privacy rights previously unrecognized by this court. Donor X is only entitled to the same protection and safeguards under the law as any other person, whether or not he suffers from AIDS.

## V

The blood banks urge this court to establish a general rule of nondisclosure of donor identity as a matter of public policy. Puget Sound Blood Center points to five factors which identify the need for such a policy: (1) the frequent shortage of blood, generally; (2) potential volunteer donors advised of possible disclosure "in connection with AIDS" will not donate; (3) the threat of disclosure will encourage people to give false or inaccurate information when donating blood; (4) newly implemented tests for screening out unacceptable donors have substantially reduced the number of blood donors available to meet our area's needs; and (5) the unfounded belief of many people that the blood donation process itself may expose one to the human immunodeficiency virus, has lessened the donor population. Brief of Petitioner, at 25-30.

I do not find a need for this court to adopt a general rule of nondisclosure. First, there is no evidence that the current blood shortage is due to fear on the part of the public that donor names could be disclosed in litigation. Second, if there is a need for improving current methods of recruiting donors, this is a matter for legislative or executive action.

For example, the Legislature has provided noncommercial blood banks with limited immunity, but has not extended the same to paid voluntary donors. RCW 70.54.120.[7]

Third, the policy of this State should be to encourage donation of wholesome blood. Donors who suspect or know their blood may be contaminated *should* be discouraged from donating. In any event, transmission through exposure to contaminated blood and blood products via transfusion has been virtually eliminated because all blood sold and donated in the United States has been tested for the HIV antibodies since 1985.[8]

Currently there are two effective tests used to screen blood for HIV antibodies. Briefly, they are the ELISA (enzyme-linked immunoabsorbent assay) test and Western blot assay test. ELISA is generally given first. If a person repeatedly tests positive for the presence of HIV antibodies, Western blot is given as a confirmatory test. These two tests, taken together, are considered 99 percent accurate in screening out blood infected with HIV antibodies.[9] ELISA has been criticized for producing too many false positive results.[10] However, ELISA was developed specifically for

---

[7]RCW 70.54.120, "**Immunity from implied warranties and civil liability relating to blood, blood products, tissues, organs, or bones . . .**", provides in relevant part:

"The procurement, processing, storage, distribution, administration, or use of whole blood, plasma, blood products and blood derivatives for the purpose of injecting or transfusing the same . . . into the human body is declared to be, for all purposes whatsoever, the rendition of a service . . . and is declared not to be covered by any implied warranty under the Uniform Commercial Code, Title 62A RCW, or otherwise, and no civil liability shall be incurred as a result of any of such acts, except in the case of wilful or negligent conduct . . . [This section] shall not apply to any transaction in which the donor receives compensation . . .".

[8]National Judicial College, *AIDS Benchbook* 15 (1991) (citing Institute of Medicine/National Academy of Sciences, *Confronting AIDS: Update 1988* 47 n.7).

[9]R.J. Perey, *supra* at 9.

[10]See "*AIDS Virus Test Proves Inaccurate*," Seattle Times, May 16, 1990, at 1.

purposes of safeguarding the blood supply. As such, it is intentionally an overly sensitive test, sometimes producing false positive results.[11] The rationale behind this is "better safe than sorry." Blood that shows a positive reaction on a test is discarded and not transfused.[12] Therefore even if high-risk donors give false or inaccurate information in giving blood, the current tests will nullify the effect of such actions.

Finally, public misperceptions about the way in which one can contract HIV can only be cured by education. This is yet another matter for the Legislature.

## CONCLUSION

In sum, the majority's holding is confusing and logically inconsistent. While it affirms the trial court, it states we cannot reach the issue of privacy. The trial court ordered discovery after John Doe established a prima facie case that the information he sought was relevant and nonprivileged, thus meeting the criteria of CR 26(b)(1). The trial court's order necessarily holds that *no right of privacy exists in preventing disclosure of Donor X's identity.* The majority, by affirming the trial court's decision, must agree! For this reason I must dissent from the majority's holding that we cannot reach the issue of privacy.

I would hold the trial judge correctly granted John Doe limited access to Donor X's identifying information and would affirm. The trial court's discovery order was reasonable and was based on tenable grounds. John Doe has a right to seek redress for his exposure to the deadly human immunodeficiency virus. In fact, such a civil remedy is a substantial property right, and constitutionally based under article 1, section 10 of our State Constitution. *Hunter v. North Mason High Sch. & Sch. Dist. 403*, 85 Wn.2d 810, 814, 539 P.2d 845 (1975). Individual rights often give way to a state's legitimate exercise of its police powers in protect-

---

[11]*AIDS Benchbook*, at 16-17.

[12]*AIDS Benchbook*, at 15.

ing public health, safety and welfare. *Ketcham v. King Cy. Med. Serv. Corp.*, 81 Wn.2d 565, 569, 502 P.2d 1197 (1972). As such, the State has a compelling interest in preserving John Doe's right to court access. Anything less creates de facto immunity in the donor from his or her wrongdoing. Without disclosure of Donor X's name, John Doe is foreclosed from seeking damages from a potentially responsible party.

The blood banks' argument that public policy mandates that we adopt a rule of general donor confidentiality is meritless. There is no evidence that the current blood shortage is the result of public fear that one's identity may be disclosed should someone sue the blood bank. Paid volunteer blood donors have not been granted limited immunity by the Legislature, as have noncommercial blood donors. I do not feel this court should adopt a rule which would, in effect, create such immunity where the Legislature has declined to do so.

Finally, CR 26(c) provides adequate protection to the individual in limiting harassing or embarrassing discovery requests. The trial judge's order was within his discretion, and retained the right to control further disclosure of Donor X's identity. Donor X's privacy rights exist only up to the point where a prima facie case is established that he was the source of Doe's exposure to HIV. Once that occurs, the donor's privacy rights are extinguished and discovery proceeds accordingly.

In balancing the equities, the rights of citizens without HIV are superior to those who are infected with the disease. The public has a right to be informed of those who have the human immunodificiency virus, and those who don't, in order to protect themselves. The alternative is that a great number of citizens will innocently contract HIV and be condemned to a painful death. Faced with this, the donor's right to privacy pales into insignificance when compared to the danger of infecting others with HIV.

Reconsideration denied February 6, 1992.

TABLE 3
Breakdown of Total AIDS Cases in the U.S. by Transmission Frequency

| Transmission Categories[1] | Year Ending May 2, 1987 | | Year Ending May 2, 1988 | | Cumulative Cases and Deaths Since June 1981 | | | |
|---|---|---|---|---|---|---|---|---|
| | Number | (%) | Number | (%) | Number | (%) | Deaths | (% Cases) |
| Adults/Adolescents | | | | | | | | |
| Homosexual/Bisexual Male | 9949 | ( 66.1) | 14990 | ( 60.0) | 37999 | ( 63.4) | 21010 | ( 62.7) |
| Intravenous (IV) Drug Abuser | 2446 | ( 16.3) | 5113 | ( 20.5) | 11045 | ( 18.4) | 6203 | ( 18.5) |
| Homosexual Male and IV Drug Abuser | 1081 | ( 7.2) | 1752 | ( 7.0) | 4438 | ( 7.4) | 2637 | ( 7.9) |
| Hemophilia/Coagulation Disorder | 166 | ( 1.1) | 256 | ( 1.0) | 591 | ( 1.0) | 349 | ( 1.0) |
| Heterosexual Cases[2] | 615 | ( 4.1) | 1072 | ( 4.3) | 2463 | ( 4.1) | 1320 | ( 3.9) |
| Transfusion, Blood/Components | 386 | ( 2.6) | 752 | ( 3.0) | 1467 | ( 2.4) | 988 | ( 2.9) |
| Undetermined[3] | 402 | ( 2.7) | 1038 | ( 4.2) | 1894 | ( 3.2) | 1027 | ( 3.1) |
| Subtotal | 15045 | (100.0) | 24973 | (100.0) | 59897 | (100.0) | 33534 | (100.0) |
| Children[4] | Number | (%) | Number | (%) | Number | (%) | Deaths | (% Cases) |
| Hemophilia/Coagulation Disorder | 14 | ( 6.3) | 26 | ( 5.9) | 53 | ( 5.5) | 32 | ( 5.8) |
| Parent with/at risk of AIDS[5] | 181 | ( 80.8) | 329 | ( 74.9) | 735 | ( 77.0) | 422 | ( 76.2) |
| Transfusion, Blood/Components | 22 | ( 9.8) | 63 | ( 14.4) | 131 | ( 13.7) | 79 | ( 14.3) |
| Undetermined[3] | 7 | ( 3.1) | 21 | ( 4.8) | 36 | ( 3.8) | 21 | ( 3.8) |
| Subtotal | 224 | (100.0) | 439 | (100.0) | 955 | (100.0) | 554 | (100.0) |
| Total | 15269 | | 25412 | | 60852 | | 34088 | |

[1] Cases with more than one risk factor other than the combinations listed in the tables or footnotes are tabulated only in the category listed first

[2] Includes 1460 persons (321 men, 1139 women) who have had heterosexual contact with a person with AIDS or at risk for AIDS and 1003 persons (780 men, 223 women) without other identified risks who were born in countries in which heterosexual transmission is believed to play a major role, although precise means of transmission have not yet been fully defined.

[3] Includes patients on whom risk information is incomplete (due to death, refusal to be interviewed, or loss to follow-up), patients still under investigation, men reported only to have had heterosexual contact with a prostitute, and interviewed patients for whom no specific risk was identified; also includes one health-care worker who seroconverted to HIV and developed AIDS after documented needle-suck to blood.

[4] Includes all patients under 13 years of age at time of diagnosis.

[5] Epidemiologic data suggest transmission from an infected mother to her fetus or infant during the perinatal period.

*Source:* CDC, AIDS Weekly Surveillance Report—United States, May 2, 1988.