IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40389-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RYAN LEWIS FARR, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — In 2012, the State charged Ryan Farr with assault in the first degree. In 2013, after multiple competency evaluations, the trial court accepted Farr's plea of not guilty by reason of insanity (NGRI). In 2015, Farr filed a motion to vacate his NGRI plea, asserting he was incompetent when he entered his plea. During the resulting hearing, Farr expressed displeasure with his counsel and asked to continue the hearing. The trial court granted his request and stated that Farr could renote it in the future.

Several years later, Farr renewed his motion to vacate his NGRI plea and added a new argument—that his plea was not voluntary because he was not fully advised of his constitutional rights. The trial court, in denying his CrR 7.8 motion, found that Farr was

competent at the time he entered his plea, and that Farr knowingly, intelligently, and voluntarily entered his plea. Farr appealed the trial court's ruling.

We conclude the trial court did not abuse its discretion in finding that Farr was competent when he entered his NGRI plea. We further conclude that Farr's new argument, asserted years after filing his CrR 7.8 motion, was timely. Even assuming his plea was not voluntary, Farr fails to show that the claimed constitutional violation resulted in actual and substantial prejudice to him. We affirm the trial court.

FACTS

In 2012, Farr punched and repeatedly stabbed a woman outside a restaurant. The attack was recorded on a nearby security video camera. The State charged Farr with assault in the first degree. The information accompanying the charge contained the elements of first degree assault: "RYAN LEWIS FARR, in the County of Walla Walla, State of Washington, on or about the 21st day of September, 2012, with intent to inflict great bodily harm upon the person of VENITA JACKSON, did assault such person with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." Clerks Papers (CP) at 6.

*First competency evaluation*

On October 8, 2012, the trial court, upon a motion by Farr's counsel, ordered Eastern State Hospital (ESH) to conduct a sanity and competency evaluation. Dr. Nathan

2

Henry, on behalf of ESH, performed the evaluation two weeks later. During the interview, Farr informed Dr. Henry he had a history of auditory hallucinations. Dr. Henry noted there were a couple of instances when it appeared that Farr may have been distracted by auditory hallucinations. Farr also alluded to possible paranoid delusions about continued persecution experiences.

During the competency portion of the interview, Dr. Henry evaluated Farr on four factors: his ability to consult with counsel, his factual understanding of the courtroom proceedings, his rational understanding of the courtroom proceedings, and his overall rational ability. Dr. Henry found Farr's capacity to establish and maintain a working relationship with his attorney was normal and evidenced little competency-related impairment. Farr also responded positively to interactions with his attorney.

Dr. Henry believed Farr had an adequate understanding of courtroom procedures and elements of a pending trial even though he had antisocial attitudes about the legal system and possible delusional beliefs. "Farr knew that he [was] being charged with . . . First Degree Assault, . . . knew that his charge[ was a felony] and knew that a felony [was] more serious than a misdemeanor. Mr. Farr knew that he could potentially spend the rest of his life in prison if convicted of [the charge]." CP at 269-70.

During the rational understanding of courtroom procedures portion, Dr. Henry found Farr's capacity to make decisions was only in the moderately impaired range and

3

noted most individuals in this range are competent to stand trial. However, Farr exhibited

paranoid delusions related to his perceptions of the possible outcomes of his case that

negatively impacted his perception of the legal proceedings, his legal decision making,

and the possible outcomes of his case.

While Dr. Henry believed that Farr had an overall capacity for rational thinking in

court-related proceedings, when combined with Dr. Henry's observations, he found Farr

not competent and requested an order of 90 days of competency restoration. Dr. Henry

diagnosed Farr with a psychotic disorder and a history of polysubstance dependence.

Because of changes to chapter 10.77 RCW, Dr. Henry did not address the sanity question.

Based on this report, the trial court stayed proceedings for 90 days and committed

Farr to ESH for competency restoration treatment.

*Second competency evaluation*

Dr. Henry reevaluated Farr and issued a report on March 5, 2013 finding him

competent after restoration. Dr. Henry opined that Farr's personality traits were the

primary issues contributing to his behavior and emotional instability. Dr. Henry also

believed that Farr's psychotic symptoms were possibly linked with his substance abuse.

Dr. Henry remarked on Farr's problematic behaviors at ESH during his stay though the

severity had lessened in recent weeks, possibly due to his prescribed psychiatric

medications. Before the interview, Dr. Henry observed a nurse give Farr an antipsychotic

4

medication with significant sedating effects. Farr became increasingly heavy-eyed during the interview and slurred some of his words.

When Dr. Henry evaluated Farr on the same factors as discussed above, he believed that Farr would be able to adequately assist his attorney in his own defense. He based this on Farr's positive attitudes toward his attorney and an appropriate tendency to rely on his attorney's advice. Farr still had negative and antisocial attitudes toward the legal process, but Dr. Henry did not believe his attitudes were reflective of psychosis.

Dr. Henry also believed that Farr had a good understanding of courtroom proceedings. Farr was able to correctly identify the primary figures in the courtroom and their respective roles. Farr knew he was charged with assault in the first degree. Farr knew that his charges were felonies, knew that a felony is more serious than a misdemeanor, and knew that a defendant could spend time in jail or prison if convicted of these charges. "He described Assault as 'hurting somebody I guess'" and "knew that a jury determines the verdict in a jury trial." CP at 278.

On Farr's rational understanding of courtroom proceedings, Dr. Henry noted that Farr still made statements reflecting persecutory delusions that impacted his perception of whether he could get a fair trial. However, other statements appeared derivative of his "negative attitudes towards authority figures; emotional reactivity; and anxiety associated with [ ] trauma." CP at 278. Farr also "reflected [a] rational understanding of a plea

5

bargain and reasonable factors a defendant might consider in deciding whether or not to accept an offer from the prosecuting attorney." CP at 278. Based on the above, Dr. Henry believed that Farr had the "capacity to understand the proceedings against him and to participate in his own defense." CP at 279.

On April 8, 2013, having reviewed Dr. Henry's report, the trial court entered an order of competency. On the same day, Farr entered a plea of not guilty. He confirmed that the information of the charge had been read to him and that he had been provided with a copy of the information.

*Appointing the guardian ad litem*

Following the entry of Farr's plea of not guilty, his counsel filed a motion asking the trial court to appoint Mark Farr, Farr's father, as a guardian ad litem (GAL) pursuant to RCW 4.08.060. In the declaration accompanying the motion, Farr's counsel stated he had reviewed the charges with Farr, including the elements of each charge, and had read the discovery information to him. However, counsel was uncertain if Farr understood the magnitude of the charges even when the information was explained on a weekly basis. Counsel attributed this to Farr's heavy medication, part of his restoration treatment. Because counsel was concerned about Farr's ability to retain and understand information, he thought it best to appoint a GAL.

The trial court granted the motion and ordered the appointment of Mark Farr as a GAL. The trial court found that Farr "was determined to be incompetent to stand trial; that [his] competency has been restored through medication therapy; that [he] does not appear to understand the ramifications of the crimes charged; and that [his] interests can be protected by a Guardian Ad Litem." CP at 253.

*Third competency evaluation*

On May 17, 2013, Farr's counsel moved for a sanity evaluation by Dr. Philip Barnard, a forensic psychologist, noting that ESH had declined to determine Farr's sanity when he committed the assault. The trial court granted the motion and ordered Dr. Barnard to evaluate Farr's competency and sanity.

Dr. Barnard made his report on June 11, 2013. During the interview, Farr reported his recurrent auditory hallucinations had lessened since taking antipsychotic medication. Dr. Barnard also agreed with ESH's prior assessment that Farr's delusions stemmed from his paranoid nature. When speaking with Farr about the night of the incident, Farr stated he drank a fifth of Black Velvet, blacked out, did not remember anything from that night, and strongly asserted he was not guilty of the charge. When Dr. Barnard asked if it was possible that he assaulted the woman but did not remember it, (and alluding to the video showing that Farr did indeed stab her), Farr became defensive and then confused.

7

During the competency assessment portion, Farr was able to articulate the charges against him. But Dr. Barnard believed that Farr was severely incapacitated in his knowledge of available legal defenses. He based this on the following answers:

> [T]o the question "*How do you think you can best be defended against these charges?*" Mr. Farr replied "Forensic." To the question "*How can you explain your way out of these charges?*" Mr. Farr replied "It was not me." To the question "*What do you think your lawyer should concentrate on to best defend you?*" Mr. Farr replied "It was not me."

CP (No. 33327-2-III)[1] at 47.

Of particular importance to this appeal, Dr. Barnard noted that Farr "would be interested in a plea bargain if it meant that he could be sent to a mental hospital rather than to prison." CP (No. 33327-2-III) at 47. Dr. Barnard diagnosed Farr with a psychotic disorder, cognitive disorder, learning disorder, polysubstance abuse, mild mental retardation, and a personality disorder. Dr. Barnard's opinion was that Farr was legally insane at the time of the incident because his impaired reality, defects in judgment and reasoning, and mental defects "grossly impaired his ability to tell right from wrong and be aware of the nature and consequences of his actions." CP (No. 33327-2-III) at 48.

---

[1] Reports of proceedings and clerk's papers for cause no. 33327-2-III have been transferred into the record for cause no. 40388-2-III. We will include that cause number in those citations to differentiate from the reports of proceedings and clerk's papers for cause no. 40388-2-III.

*Fourth competency evaluation*

On July 5, 2013, the State moved for an additional sanity and competency evaluation by ESH, which the court granted. However, after the trial court reviewed Dr. Barnard's report a couple of days later, it found that Farr's competency needed to be restored and amended the order to include a 90-day restoration period.

On October 8, 2013, after Farr's second restoration period, Dr. Randall Strandquist, on behalf of ESH, evaluated Farr for the fourth time and submitted a report finding Farr had the capacity to assist his attorney and was sane during the incident. Of particular importance to this appeal, Dr. Strandquist, when reviewing Farr's time at ESH, highlighted a progress note that he believed showed Farr's "accurate understanding of court proceedings." CP at 313. Farr was quoted as saying:

> "'I was found competent before and as soon as I'm found competent again my attorney will file the paperwork for NGRI. We paid $3000 for a private investigator/evaluator who said I'm competent but was crazy at the time I committed my crimes. The prosecutor will sign off and I'll do 10 years upstairs compared to 30 years in prison. I'll be safer here too, since I'm a gang member.'"

CP at 313.

During the competency portion of the interview, Farr was able to explain the roles and responsibilities of the judge, defense attorney, prosecuting attorney, witnesses, and jury. He was able to identify his attorney and how to contact him. He knew and could

9

explain the concept of a plea bargain and was aware of his plea options regarding the

charges. Farr also knew that a sentencing follows a guilty plea and a trial follows a not

guilty plea and could correctly identify the crimes for which he was charged.

*The NGRI plea*

On November 1, 2013, Farr filed a motion for judgment acquitting him of

assault by reason of insanity and a written NGRI plea signed by Farr and his counsel. In

his plea, Farr stated:

> It is my belief that at the time of committing this offense I was
> legally insane.
> It is further my belief that since being committed to State Hospital
> subsequent to being arrested on these charges, I am now competent to stand
> trial and to appreciate the quality of my acts although I am still suffering
> from Psychotic Disorder not otherwise specified and cognitive disorder, not
> otherwise specified.
> In making this plea I understand that if the court accepts my plea and
> my motion for acquittal by reason of insanity that I am admitting that I
> committed the acts charged in the information, and if the court finds that I
> was not responsible by reason of my mental condition I am waiving my
> constitutional right to a jury trial on that issue. I also understand that I may
> not later contest the validity of my detention on the ground that I did not
> commit the acts charged.
> Furthermore, if the court accepts the motion, I waive my
> constitutional right to have a jury determine whether I am dangerous to
> others or likely to commit felonious acts jeopardizing public safety or
> security, and I give up the right to confront my accusers. I understand that I
> may be subject to commitment as criminally insane for as long as the
> maximum penal sentence for the offenses charged, which is life.
> My attorney has explained to me, and we have fully discussed, the
> above consequences of this plea. I understand the nature and consequences
> of this plea and have no questions of the court.

CP (No. 33327-2-III) at 8-9.

On the same day, the trial court held a hearing to determine whether to accept

Farr's plea. Although Dr. Strandquist had recently found that Farr was sane at the time of

the offense, the State stipulated to Dr. Barnard's differing opinion.

In support of the plea, Farr's counsel noted that each time Farr went to ESH he

came back a little better and counsel believed that an NGRI plea was the best alternative

for Farr. Farr's counsel confirmed that he discussed the plea with Farr a few days before.

Mark Farr, in his capacity as GAL, also attended the discussion between his son and his

attorney.

At the plea hearing, Mark Farr spoke to the court:

> The thing is that [my son] doesn't need prison. He doesn't do well
> in prison. He didn't get treated in prison. He doesn't need to be locked in a
> room 23 hours a day and isolated from everybody. My son needs
> treatment. And we believe this is the best—the best thing for him.
> Whether it takes seven, ten, twenty years, I don't care. I just want him to
> get better and have that chance. So I'm asking you to agree with this
> motion.

Report of Proceedings (RP) (No. 33327-2-III) (Nov. 1, 2013) at 5.

The trial court addressed Farr.

> THE COURT: . . . Mr. Ryan Farr, I have in front of me your plea of
> not guilty by reason of insanity. And I just want to go through a few items
> with you.
> Does that make sense?
> [MR. FARR]: Yeah.

THE COURT:  Okay.  You are alleging that at the time of the offense, you were legally insane; correct?

[MR. FARR]:  Yes.

THE COURT:  And you are at this time competent to stand trial and that you appreciate the quality of the acts, even though you suffer from a psychotic disorder?

[MR. FARR]:  Yes.

THE COURT:  Do you understand that if the Court accepts this motion, you waive your right to have a jury determine whether you are dangerous to others or not?

[MR. FARR]:  Yeah.

THE COURT:  And that by entering this plea, you are waiving your constitutional right to a jury trial?

. . . .

[MR. FARR]:  Yes.

THE COURT:  And in addition, you give up the right to confront any accusers in this matter?

[MR. FARR]:  Yeah.

THE COURT:  And most importantly, you understand that you may be subject to commitment as criminally insane for as long as the maximum penalty sentence for the offense charged, which could be life; do you understand that?

[MR. FARR]:  Yeah.

THE COURT:  I believe that the Defendant is competent and understands the plea statement.

RP (No. 33327-2-III) (Nov. 1, 2013) at 5-6.

The court made the following findings of fact and conclusions of law:

1.      The Defendant committed the act alleged in Count 1 of the information;

2.      The defendant was legally insane at the time of the commission of the act alleged in the information and is not legally responsible for said acts;

12

>       3.      There is a substantial danger that the defendant may injure
> other persons or himself unless kept under further control by the court or
> other appropriate institutions;
>       4.      There is a substantial likelihood that the defendant may
> commit felonious acts jeopardizing the public safety or security unless kept
> under further control by the court or other appropriate institutions;
>       5.      It is in the best interests of the defendant and the public that
> the defendant, Ryan Lewis Farr be placed in treatment at the state mental
> hospital at Eastern State Hospital . . . .
>               . . . .
>       1.      That the court has jurisdiction over the parties and subject
> matter of this cause.
>       2.      That an order should be entered remanding the defendant to
> the jurisdiction of Eastern State Hospital for the appropriate treatment as
> being criminally insane, pursuant to RCW chapter 10.77.

CP at 21-22.

The trial court also entered an order of commitment consistent with the findings

and conclusions and committed Farr to ESH, subject to conditional release or final

discharge.

*Postconviction proceedings*

Starting on October 7, 2014, Farr sent three letters to the trial court, each a few

months apart. The letters asked the court to vacate his NGRI plea because Farr believed

he was incompetent at the time of the hearing, he could not remember the hearing, and

there was a conflict between him and his counsel. On April 24, 2015, Farr filed a

personal restraint petition (PRP) in this court. A few days later, Farr's counsel filed a

13

notice of (direct) appeal with this court seeking review of the trial court's findings of fact and conclusions of law entered relating to his NGRI plea.

Soon after, this court ruled that the PRP was technically untimely but found it related back to Farr's first letter to the trial court, thus rendering it timely. The PRP matter was referred back to the trial court because no action had been taken by the trial court on his request to vacate his plea, and it remained "the role of that court to determine [the] appropriate disposition of the matter under CrR 7.8(c)." CP at 334.

In June 2015, Farr filed in the trial court a CrR 7.8 motion to vacate his NGRI plea. In March 2016, the trial court heard Farr's motion to vacate his NGRI plea. Farr's counsel called Dr. Barnard as an expert witness. Dr. Barnard testified he found Farr incompetent in June 2013 because Farr failed to understand courtroom procedure and charges and penalties, and because Farr's ability to cooperate with his lawyer was borderline marginal. In preparation for the hearing, Dr. Barnard had reexamined Farr to determine his competency and reviewed the ESH report finding Farr competent in 2013 after his second restoration. After the reexamination, Dr. Barnard believed Farr was now competent. However, although Dr. Barnard had not seen Farr between his second restoration in October 2013 and Farr's November 1, 2013, NGRI plea, Dr. Barnard disagreed with ESH's October 2013 report finding Farr competent near the time of that plea.

14

The court recessed for the morning. When the court reconvened, Farr asked to speak directly with the court. Farr expressed dissatisfaction with his counsel's questioning of Dr. Barnard, wanted to retain a new attorney, and asked that the hearing be continued. The court responded:

> I am not appointing a new attorney. He is your appointed counsel and he [will] continue.
> Having said that, if you are wanting to continue this hearing for whatever reason and schedule it down the road, that's up to you.
> [MR. FARR]: I would like to do that.
> THE COURT: Okay. The matter can be renoted at some point in the future, but [your attorney] continues to be your counsel.

RP (No. 33327-2-III) (Mar. 3, 2016) at 27-28.

Over the next several years, Farr had multiple review hearings to determine the appropriateness for being conditionally released from ESH. In December 2022, ESH granted him conditional release. While on release, Farr violated his conditional release terms by not attending treatment programs, refusing to provide urine samples, not following house rules at his assisted living facility, and consuming nonprescribed substances, including methamphetamine. In October 2023, the trial court revoked his conditional release and ordered him returned to ESH. The trial court concluded revocation of conditional release was appropriate because Farr continued to be a threat to public safety given Farr's index offense of assault in the first degree was committed while under the influence of illegal controlled substances.

15

In November 2023, Farr filed a renewed CrR 7.8 motion in the trial court to vacate his NGRI plea. On April 18, 2024, the motion came before the trial court. Farr asserted he was not told the essential elements of the offense, he was not told that he had a right to remain silent, and he was not told of possible sentencing alternatives. He also renewed his argument that he was not competent at the plea hearing. After hearing arguments, the court denied Farr's motion to vacate his NGRI plea. The court found that Farr's "plea was knowingly, intelligently and voluntarily made" based on

> reports from both [ESH] and from [Mr. Farr]'s expert considered at
> the time of the plea, [Mr. Farr]'s motion and the stipulation which he
> had signed certifying to his complete understanding of all aspects of his
> plea . . ., his counsel's indication that he felt [Mr. Farr] was competent and
> fully understood the plea, the lack of any evidence that Mr. Farr did not
> understand the consequences of his plea, and the fact that his responses to
> the court at the plea hearing were coherent.

CP at 236-37.

Farr appeals the trial court's denial of his CrR 7.8 motion.

ANALYSIS

*Standard of review*

A motion to withdraw a plea after a judgment is entered is governed by CrR 7.8. CrR 7.8(b) allows a court to grant relief from a final judgment for mistakes, for newly discovered evidence, for fraud, where a judgment is void, or for any other reason justifying relief. Judgments resulting from pleas that violate due process are void and

16

subject to collateral attack pursuant to CrR 7.8(b)(4). *State v. Olivera-Avila*, 89 Wn. App. 313, 319, 949 P.2d 824 (1997).

We review a trial court's ruling on a CrR 7.8 motion for an abuse of discretion. *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012). A trial court abuses its discretion if the decision "is manifestly unreasonable or based upon untenable grounds or reasons." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). "A court's decision 'is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.'" *Lamb*, 175 Wn.2d at 127 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

*Scope of CrR 7.8 motion to be reviewed*

When Farr first filed his CrR 7.8 motion in 2015, it did not identify under which basis of CrR 7.8(b) he sought relief. In his 2023 renewed motion, he identified CrR 7.8(b)(5) as the basis of relief: "[a]ny other reason justifying relief from the operation of the judgment." It was under this basis that the trial court heard and denied Farr's motion to vacate his NGRI plea.

On appeal, Farr identifies CrR 7.8(b)(4) as his basis for relief: "[t]he judgment is void." Because we are reviewing the trial court's order denying Farr's motion to vacate his plea and because Farr did not present CrR 7.8(b)(4) as his basis for relief, we will not consider his new argument under CrR 7.8(b)(4); rather, we will confine our analysis to

17

the theory argued to the trial court. *Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 780, 819 P.2d 370 (1991) (appellate courts will not consider theories not presented below).

"'Relief under CrR 7.8(b)(5) is limited to extraordinary circumstances not covered by any other section of the rule.'" *State v. Williams*, 15 Wn. App. 2d 841, 847, 480 P.3d 1145 (2020) (quoting *State v. Smith*, 159 Wn. App. 694, 700, 247 P.3d 775 (2011)) "'Extraordinary circumstances include fundamental and substantial irregularities in the court's proceedings or irregularities extraneous to the court's action.'" *Id*. (quoting *Smith*, 159 Wn. App. at 700). "A violation of a fundamental constitutional right . . . would be a reason to justify relief." *State v. McGuire*, 12 Wn. App. 2d 88, 94, 456 P.3d 1193 (2020).

A. FARR WAS COMPETENT WHEN HE ENTERED THE NGRI PLEA

Farr argues he was not competent to enter an NGRI plea, which invalidates it and any order from it. We disagree.

*Special standard of review for mental competency*

"Reviewing courts in Washington customarily defer to the trial court's judgment of a defendant's mental competency." *State v. Coley*, 180 Wn.2d 543, 551, 326 P.3d 702 (2014). Appellate courts "will reverse a trial court's competency decision only upon finding an abuse of discretion." *Id*. "A trial court abuses its discretion when it relies 'on facts unsupported in the record,' applies 'the wrong legal standard,' or 'adopts a view that

18

no reasonable person would take.'" *Doe v. Thurston County*, 4 Wn.3d 906, 915, 569 P.3d 1101 (2025) (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

*Competency*

The party challenging competency has the burden "to prove by a preponderance of the evidence that the defendant [was] incompetent." *Coley*, 180 Wn.2d at 555. Farr is challenging his competency when he entered the NGRI plea. Thus, he has the burden to prove he was incompetent.

In Washington, incompetent defendants may not be "tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." Former RCW 10.77.050 (1974), *recodified as* RCW 10.77.600 (LAWS OF 2025, ch. 358, § 2, effective July 27, 2025). The policy of this statute is simple, it "'seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel.'" *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 862, 16 P.3d 610 (2001) (quoting *Godinez v. Moran*, 509 U.S. 389, 402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993)). If there is a reason to doubt a defendant's competency to stand trial, the court must order an expert to evaluate the defendant's mental condition. Former RCW 10.77.060(1)(a) (2012), *recodified as* RCW 10.77.400(1)(a) (LAWS OF 2025, ch. 358, § 2, effective July 27, 2025). Upon the motion of any party, the court may order an evaluation and

19

report on the defendant's mental condition. Former RCW 10.77.060(1)(a). If the court finds the defendant incompetent following an evaluation, it must stay the proceedings and may commit the defendant for treatment. Former RCW 10.77.084(1)(a) (2012), *recodified as* RCW 10.77.635(1)(a) (LAWS OF 2025, ch. 358, § 2, effective July 27, 2025). At a competency hearing following restoration treatment in a felony case, the court must determine whether, by a preponderance of the evidence, the defendant is incompetent. Former RCW 10.77.086(3) (2012), *recodified as* RCW 10.77.645(3) (LAWS OF 2025, ch. 358, § 2, effective July 27, 2025).

The legal competency test for a criminal defendant in Washington is whether the defendant understands the nature of the charges and whether he can assist in his defense. *Fleming*, 142 Wn.2d at 862. When determining whether a competency hearing is necessary, the trial court may consider "the defendant's behavior, demeanor, appearance, personal and family history, and psychiatric reports." *State v. McCarthy*, 193 Wn.2d 792, 801, 446 P.3d 167 (2019). Credibility of the competency evaluators is for the trial court to determine. *State v. Benn*, 120 Wn.2d 631, 662, 845 P.2d 289 (1993).

If the trial court decides that a defendant is competent, it need not reconsider competency unless there is evidence that the defendant's condition has changed since their prior competency hearings. *State v. Oritz*, 119 Wn.2d 294, 300-01, 831 P.2d 1060

20

(1992) (plurality opinion), *overruled on other grounds by State v. Condon*, 182 Wn.2d 307, 323, 343 P.3d 357 (2015).

Here, Farr's competency to assist in his defense was evaluated three times prior to the entry of his plea. The first evaluation by ESH found him incompetent and the trial court ordered a 90-day competency restoration. Several months later, the trial court questioned Farr's competency to assist in his defense and again ordered a period of competency restoration. After that period, ESH evaluated him and found him competent. Two weeks later, he entered his NGRI plea.

Farr contends that the appointment and retention of his father as GAL shows that he still was incompetent when he entered his NGRI plea. We disagree.

Washington criminal statutes do not address the appointment of a GAL for someone believed to be incompetent. Instead, proper procedure under such circumstances is to have the defendant evaluated and treated for restoration if found incompetent. Former RCW 10.77.060(1)(a); former RCW 10.77.084(1)(a). That was done here multiple times.

Instead, defense counsel out of concern for Farr turned to our civil statutes. RCW 4.08.060(2) provides the court shall appoint a GAL to an incapacitated defendant upon application of a relative or friend, or any party to the action. The role of a GAL is to act "for the benefit of and to protect the rights and best interests of the alleged

21

incompetent to whom [they are] assigned." *In re Quesnell*, 83 Wn.2d 224, 235, 517 P.2d 568 (1973). Notably, defense counsel believed that appointment of Farr's father as GAL was appropriate not because Farr was incompetent but because Farr's court-ordered medication affected his ability to remember their discussions.

There is no evidence suggesting that the last ESH physician who found him competent did not carefully evaluate Farr's ability to understand the nature of his charge and his ability to assist in his defense. Additionally, there is no evidence between the last evaluation and the plea hearing suggesting that Farr's behavior, demeanor, and appearance should have alerted the trial court that a competency evaluation was warranted. As later found by the trial court, Farr's behavior was rational during the plea hearing. Farr's replies were not disjointed or incoherent. His counsel did not raise any concerns as to his competency and counsel also commented that Farr was better each time he returned from ESH. We conclude that the trial court, at the renewed CrR 7.8 hearing, did not abuse its discretion by finding Farr competent at the time he entered his NGRI plea.

B.    CONSTITUTIONAL RIGHT THAT NGRI PLEA BE VOLUNTARY

Farr argues that his NGRI plea was not voluntary because he was not fully advised of his constitutional rights.

22

Upon the accused's motion, a trial court may acquit a defendant on the grounds of insanity and enter an order of commitment. Former RCW 10.77.110(1) (2000), *recodified as* RCW 10.77.530(1) (LAWS OF 2025, ch. 358, § 2, effective July 27, 2025); former RCW 10.77.080 (1998), *recodified as* RCW 10.77.515 (LAWS OF 2025, ch. 358, § 2, effective July 27, 2025). Washington courts recognize that the acceptance of a motion for acquittal on the grounds of insanity and a related plea must satisfy due process. *State v. Brasel*, 28 Wn. App. 303, 312, 623 P.2d 696 (1981). To satisfy due process, the defendant must enter the plea voluntarily and intelligently, i.e., understand both the "nature of the charges against him and the consequences of the motion." *Id*.

Before we discuss this issue further, we first address the State's argument that Farr's challenge to the voluntariness of his plea is time barred.

### 1. Timeliness of raising the voluntariness issue

The State argues Farr's motion to vacate his NGRI plea based on the plea not being voluntary is untimely because it was not asserted until several years after Farr's NGRI order of acquittal and commitment became final. We disagree.

As noted previously, we are reviewing a collateral attack to Farr's NGRI order of acquittal. RCW 10.73.090(1). Generally, a collateral attack may not be filed more than one year after the judgment becomes final. RCW 10.73.090(1). Amendments to a collateral attack generally also must be made within this one-year limitation. *In re Pers.*

23

*Restraint of Benn*, 134 Wn.2d 868, 938-39, 952 P.2d 116 (1998). The NGRI order

became final on April 14, 2017, when this court issued its mandate dismissing Farr's first

appeal.

The one-year time bar applies to NGRI judgments. *In re Pers. Restraint of Well*,

133 Wn.2d 433, 441, 946 P.2d 750 (1997). Courts do not have discretion to waive or

alter the limitation period in RCW 10.73.090, and the petitioner carries the burden to

prove the applicability of an exception to the statute of limitations. *Shumway v. Payne*,

136 Wn.2d 383, 400, 964 P.2d 349 (1998).

If a court acquits a defendant by reason of insanity, the court must advise the

defendant "of the time limits on the right to collateral attack imposed by RCW 10.73.090

and .100." CrR 6.16(d)(1)(ii). Specifically, the court must advise such a defendant:

> You are further advised that if you wish to petition or move for
> collateral attack on any order of hospitalization or order mandating
> alternative treatment less restrictive than detention in a state hospital,
> including but not limited to any personal restraint petition, state habeas
> corpus petition, motion to vacate judgment, motion to withdraw guilty plea,
> motion for new trial or motion to arrest judgment, you must do so within
> one year of the final judgment in this matter, except as provided for in
> RCW 10.73.100.

CrR 6.16(d)(2).

When a statute requires a court to notify a defendant of a time bar and the

notice is not given, this omission creates an exemption to the time bar, and a court

24

must treat the defendant's petition for collateral review as timely. *In re Pers. Restraint of Vega*, 118 Wn.2d 449, 450-51, 823 P.2d 1111 (1992) (applying rule to RCW 10.73.120); *State v. Schwab*, 141 Wn. App. 85, 91, 167 P.3d 1225 (2007) (applying rule to RCW 10.73.090).

Here, Farr's amendment to his collateral attack was made in November 2023. This was six years after we issued the mandate in Farr's first direct appeal. But the State fails to cite any record of the trial court having advised Farr of his right to collaterally attack the NGRI order within one year of it becoming final. Because the trial court failed to advise Farr of this right, the one-year time bar does not apply.

### 2. Voluntariness of Farr's NGRI plea

Because an NGRI plea has many of the same consequences as a plea of guilty, Washington courts equate the two for due process purposes. *Brasel*, 28 Wn. App. at 312. Therefore, a defendant entering an NGRI plea must have been informed of and understood "(1) the essential elements of the offense charged; (2) that by making the motion he admitted to committing the acts charged and that, if acquitted, he might not later contest the validity of his detention on the ground that he did not commit the acts charged; (3) that by making the motion he waived his rights to remain silent, to confront his accusers, and to be tried by a jury; and (4) that, if acquitted, he could be committed to

25

a state hospital for the criminally insane for a term up to the maximum possible penal sentence for the offense charged." *Id*. at 313.

The trial court has a duty to ensure the defendant is sufficiently informed and thus capable of entering a constitutional plea. *State v. Holsworth*, 93 Wn.2d 148, 155, 607 P.2d 845 (1980). If "the record of a plea-taking procedure fails to demonstrate that constitutional standards were satisfied, but the procedure conformed to all applicable statutes and court rules, the State must make 'a clear and convincing showing that the plea was in fact knowingly and understandably entered,' but may introduce evidence extrinsic to the plea hearing record in making this showing." *Brasel*, 28 Wn. App. at 312-13 (quoting *Wood v. Morris*, 87 Wn.2d 501, 507, 554 P.2d 1032 (1976)).

Farr contends that his NGRI plea violated his right to due process because neither the trial court nor his counsel advised him of (a) the elements of the charge against him, (b) the possible sentencing alternatives, and (c) that he would be waiving his right to remain silent. For now, we accept Farr's argument that his NGRI plea was not voluntary for one or more of the above reasons. But because Farr's challenge is a collateral attack on a final order, he must show more than constitutional error.

Obtaining relief from a conviction based on a collateral attack is "extraordinary." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). This is because a collateral attack "'undermines the principles of finality of litigation, degrades

the prominence of trial, and sometimes deprives society of the right to punish admitted offenders.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 670, 101 P.3d 1 (2004) (quoting *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992)). Final judgments will be upheld unless the petitioner demonstrates a constitutional error that resulted in actual and substantial prejudice or a nonconstitutional error that constitutes a fundamental defect that inherently resulted in a complete miscarriage of justice. *Coats*, 173 Wn.2d at 132. The petitioner bears the burden of showing prejudicial error by a preponderance of evidence. *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004). Bare assertions unsupported by the record, citation to authority, or persuasive reasoning cannot sustain the petitioner's burden of proof. *State v. Brune*, 45 Wn. App. 354, 363, 725 P.2d 454 (1986).

Here, the record shows that Farr embraced the State's offer of an NGRI plea. First, from an evidentiary perspective, Farr's knife attack on the woman was recorded on security video. His best hope for avoiding a lengthy prison sentence was an NGRI plea. Second, one month before Farr's plea, Dr. Strandquist found a progress note in Farr's ESH file that quoted him as saying:

"'I was found competent before and as soon as I'm found competent again my attorney will file the paperwork for NGRI. We paid $3000 for a private investigator/evaluator who said I'm competent but was crazy at the time I committed my crimes. The prosecutor will sign off and I'll do 10 years upstairs compared to 30 years in prison. I'll be safer here too, since I'm a gang member.'"

CP at 313.

Third, Farr's father, the appointed GAL, supported the State's generous offer:

The thing is that [my son] doesn't need prison. He doesn't do well in prison. He didn't get treated in prison. He doesn't need to be locked in a room 23 hours a day and isolated from everybody. My son needs treatment. And we believe this is the best—the best thing for him. Whether it takes seven, ten, twenty years, I don't care. I just want him to get better and have that chance. So I'm asking you to agree with this motion.

RP (No. 33327-2-III) (Nov. 1, 2013) at 5.

Fourth, Farr's hired expert confirmed that Farr "would be interested in a plea bargain if it meant that he could be sent to a mental hospital rather than to prison." CP (No. 33327-2-III) at 47.

The record could not be more clear. Even had the trial court fully advised Farr of his constitutional rights before his NGRI plea, Farr would have entered his NGRI plea. Farr fails to satisfy his burden of showing that the claimed constitutional errors resulted in actual and substantial prejudice.

No. 40389-1-III
*State v. Farr*

We affirm the trial court's order denying Farr's CrR 7.8 motion.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____        _____
Cooney, J.                              Murphy, J.

29